UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
GREGORY TYRONE BERRIE,

                                            Plaintiff,

            - against -
                                                                    **OPINION AND ORDER**

BOARD OF EDUCATION OF THE PORT                                          No. 14-CV-6416 (CS)
CHESTER-RYE UNION FREE SCHOOL DISTRICT,
ASSISTANT SUPERINTENDENT FRANK
FANELLI, and PRINCIPAL PATRICK SWIFT,
in their individual and professional capacities,

                                            Defendants.
------------------------------------------------------------------------x

Appearances:
Howard Schragin
Ann L. Moscow
Sapir Schragin LLP
White Plains, New York
*Counsel for Plaintiff*

Maurizio Savoiardo
Miranda Sambursky Slone Sklarin Verveniotis LLP
Mineola, New York
*Counsel for Defendants*

Seibel, J.

        Before the Court is Defendants' Motion for Summary Judgment.  (Doc. 68.)  For the

following reasons, the Motion is GRANTED.

## I.      BACKGROUND

        The following facts are undisputed unless otherwise noted.[1]

---

[1] Plaintiff in his Statement Pursuant to Local Rule 56.1, (Doc. 67 ("56.1 Stmt. & Resp.")), contests several
paragraphs in Defendants' Local Rule 56.1 Statement, (Doc. 71), by denying "knowledge or information sufficient
to admit or deny th[e] statement," (*see, e.g.*, 56.1 Stmt. & Resp. ¶¶ 16, 18, 19, 32), disputing the implication of the
asserted factual statement, (*see, e.g.*, *id.* ¶¶ 22, 30, 183, 263, 282), or disclaiming knowledge as to whether the facts
are true, (*id.* ¶¶ 46, 278).  Such responses do not suffice to create a dispute.  *Cooper v. City of New Rochelle*, 925 F.
Supp. 2d 588, 605 (S.D.N.Y. 2013).  Plaintiff had the opportunity to take discovery, and any properly supported
facts in Defendants' 56.1 Statement that Plaintiff failed to properly address in his 56.1 counterstatement are deemed

1

Plaintiff first worked at the Port Chester-Rye Union Free School District (the "District") from 1990-1992 as a Teaching Assistant, having been recruited by Defendant Frank Fanelli. (56.1 Stmt. & Resp. ¶¶ 7-8.) In 2002, again having been recruited by Fanelli, Plaintiff began working as a physical education teacher, (*id.* ¶ 9), receiving tenure in 2006, (*see id.* ¶¶ 218, 221). Plaintiff at some point was transferred to the Port Chester Middle School, where he currently works, (*see* AC ¶ 17),[2] and where Defendant Patrick Swift is principal, (Savoiardo Decl. Ex. K, at 9).[3] Swift expressed his displeasure at not having a choice in the matter, writing in an email that he was "not happy" about Plaintiff's transfer and did not want to take the "tired, hungry, and oppressed" because the Middle School had "com[e] too far to become a dumping ground." (Schragin Decl. Ex. 31.)[4]

## A. Alleged Discriminatory Incidents

### 1. Iantorno Email

On February 2, 2013, Jeannie Iantorno, Plaintiff's colleague, forwarded an email, (Savoiardo Decl. Ex. GG (the "Iantorno Email")), with the subject line "New Species of Man," containing a photograph of a minority teenager, who Plaintiff and others believed to be African

---

undisputed. *See* Fed. R. Civ. P. 56(e)(2); *see also Scaprinato v. 1770 Inn, LLC*, No. 13-CV-955, 2015 WL 4751656, at *2 n.3 (E.D.N.Y. Aug. 11, 2015) (response that plaintiff "denies possessing knowledge or information sufficient to form a belief as to the truth or the veracity" after discovery has concluded) (collecting cases). Additionally, Plaintiff challenges several statements by claiming that "the evidence cited is inadmissible hearsay." (56.1 Stmt. & Resp. ¶¶ 15, 16, 18, 29, 32, 41, 42, 67, 72-77, 79-81, 144, 150, 153.) To the extent Defendants offer out-of-court statements for which no hearsay exception exists, I consider the statements not for their truth, but for the fact they were said. *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 465 n.9 (S.D.N.Y. 2011) ("[T]he statements in [reports of an incident] are not being admitted for the truth stated therein, but rather for the fact that Defendants received these descriptions of the incident."). Moreover, to the extent that Plaintiff's response does not relate to the asserted fact, the fact will be deemed admitted. *See Peters v. Mount Sinai Hosp.*, No. 08-CV-7250, 2010 WL 1372686, at *4 (S.D.N.Y. Mar. 30, 2010) (accepting as true statements as to which plaintiff's denials and counterstatements were unrelated to Defendants' stated facts).

[2] "AC" refers to the Amended Complaint. (Doc. 40.)

[3] "Savoiardo Decl." refers to the Declaration of Maurizio Savoiardo. (Doc. 69.)

[4] "Schragin Decl." refers to the Declaration of Howard Schragin in Support of Plaintiff's Opposition to the Motion for Summary Judgment. (Doc. 75.) Many exhibits appearing in the Schragin Declaration are duplicates of the Savoiardo Declaration Exhibits. In those instances, I will refer only to the Savoiardo Declaration Exhibits.

American, (56.1 Stmt. & Resp. ¶ 13; Savoiardo Decl. Ex. P, at 78), with his pants worn well below the waist, accompanied by two drawings – one of a man from behind with a long back, as if his waist was where the teen in the photograph wore his pants, and the other of a skeleton with the same long back, (56.1 Stmt. & Resp. ¶ 13).  Below the photograph and drawings, the email reads:

> They are referred to as homo slackass-erectus created by a natural genetic downward evolution through constant spineless posturing, and spasmatic upper limb gestures, which new research has shown to cause shorter legs and an inability to ambulate other than in an awkward shuffling gait.  The "drag-crotch" shape also seems to effect [*sic*] brain function.  Expect no eye contact or verbal communication.  This species receives benefits and full government care.  Unfortunately most are highly fertile.

(*Id.* ¶ 14; Iantorno Email.)  Iantorno forwarded the email to the Middle School faculty stating, "I think we have a few of these roaming the halls!!"  (56.1 Stmt. & Resp. ¶ 17; Iantorno Email.)  A union representative informed Iantorno the following Monday that her email was offensive to some colleagues, (56.1 Stmt. & Resp. ¶ 18), and Iantorno sent an apology email shortly thereafter to the Middle School faculty, asserting that she thought it would be humorous "since we are constantly telling our boys to pick up their pants" and that her "intention was not to stereotype or put down anyone," (*id.* ¶¶ 19-20; Savoiardo Decl. Ex. HH).  Swift met with Iantorno to discuss the email and its offensiveness, and commemorated their meeting with a February 5, 2013 letter that recounted their discussion, reprimanded her and informed her that there would be an inquiry to determine whether further action was required.  (*See* 56.1 Stmt. & Resp. ¶¶ 23-24; Savoiardo Decl. Ex. JJ.)  Subsequently, Iantorno sent a follow-up letter apologizing to the District's staff, stating that she meant the email to be funny and that her "own teenage son wears his pants in this fashion."  (Savoiardo Decl. Ex. LL.)

On February 5, 2013, Swift offered to meet with Plaintiff to discuss the email, and

Plaintiff responded, "I'm good!  Laughed about all of this with friends and moved on.  Thanks

for your concern."  (56.1 Stmt. & Resp. ¶¶ 25-26.)  Plaintiff testified that he had already

complained to his union representative and Fanelli about the email.  (*Id.* ¶ 27; Savoiardo Decl.

Ex. H, at 290-91.)  Two days later, Plaintiff sent an email to Swift and Fanelli saying that he was

"still deeply offended," but that it might be time "to shut this thing down," as "the more

[Plaintiff] hear[d] about [Iantorno] . . . [i]t doesn't seem[] like she deserve[s] this [and m]aybe

it's truly just a mistake?"  (56.1 Stmt. & Resp. ¶ 28; Savoiardo Decl. Ex. KK.)

## 2. Swift Hockey Incident

On April 4, 2013, Swift entered Plaintiff's physical education class, saw students playing

hockey and joined in.  (*See* 56.1 Stmt. & Resp. ¶¶ 35-36.)  From the opposite side of the gym

from Plaintiff, Swift hit a plastic ball across the gym and struck Plaintiff in the head (the

"Hockey Incident").  (*Id.* ¶ 36(g).)  Swift said this was an accident, (Savoiardo Decl. Ex. GGG,

at DEF000433), but Plaintiff maintains that Swift intentionally hit Plaintiff because of his race

and in retaliation for opposing the Iantorno Email, (56.1 Stmt. & Resp. ¶ 36).  After being hit,

Plaintiff left the gym and went into the locker room, where Swift followed and apologized.  (*Id.*

¶ 40.)  Plaintiff stayed home for one week following the incident due to emotional distress, (*id.*

¶ 47), and Fanelli testified that Plaintiff told him over the phone that he did not want to go to

work because he was so angry that he feared he would punch Swift, (*id.* ¶ 48).  On April 15,

2013, after Plaintiff returned to work, he attended a meeting with Swift, Assistant Principal

Byron Womack, Fanelli, Superintendent Edward Kliszus and Donna Coffin, Plaintiff's union

representative, to discuss Plaintiff's concerns.  (*Id.* ¶ 54; Savoiardo Decl. Ex. EEE, at

DEF000485.)  Plaintiff submitted a formal complaint against Swift via email to Fanelli three

days later for "physical assault, bullying and harassment." (56.1 Stmt. & Resp. ¶ 59; Savoiardo Decl. Ex. ZZ.)

### 3. Fanelli New York Times Article

On May 4, 2013, Fanelli sent Plaintiff a New York Times column by respected writer Ta-Nehisi Coates entitled "Beyond the Code of the Streets," about an instance in which the author and three friends who were also African-American professionals "refused to give in to anger when confronted by individuals who treated the group with disrespect." (56.1 Stmt. & Resp. ¶¶ 61-63; Savoiardo Decl. Ex. BBB (the "New York Times Article").) Plaintiff responded to Fanelli via email stating that he was offended because he is "not an angry black man." (56.1 Stmt. & Resp. ¶ 65; Savoiardo Decl. Ex. CCC.) Fanelli apologized; he thought the article was about the "dilemma that African American men go through when they become professionals." (56.1 Stmt. & Resp. ¶ 66.) Fanelli had distributed the same article to other administrators and teachers within the District, as well as the president of the local chapter of the NAACP. (*Id.* ¶¶ 67-68.)

### 4. Other Allegations

In addition to the Iantorno Email, the Hockey Incident and the New York Times Article, Plaintiff makes several other allegations of discrimination, including:

- on an unknown date, another teacher, Drew Ciccoria, referred to African Americans as "Alabama porch monkey[s]" and said that "Black people can't cut it in sports," (Savoiardo Decl. Ex. H, at 240-41);

- on an unknown date, Melissa Piccola, a physical education teacher at the Middle School, (Savoiardo Decl. Ex. H, at 94), may have said to Plaintiff that he "talk[s] too black," (56.1 Stmt. & Resp. ¶ 192; Savoiardo Decl. Ex. S, at 44);

- in 2006-08, Ciccoria acted inappropriately toward African-American students, making statements such as "Blacks can't cut it in football," and ridiculing a student on the basketball team, (Savoiardo Decl. Ex. GGG, at DEF000427);

- in 2010, a female teacher sexually harassed Plaintiff by sitting on his lap, (*id.* ¶¶ 231);

- sometime between 2010 and 2012, Swift asked Plaintiff, "Can't you guys spell?" after Plaintiff had misspelled Swift's name in an email, (*id.* ¶¶ 234-35);[5]

- at the April 15, 2013 meeting regarding the Hockey Incident, Swift reported that someone else asked him, "When are we going to get rid of Plaintiff and how fast are we going to get rid of him?" (*Id.* ¶¶ 238-39; Savoiardo Decl. Ex. VV.)  Swift referred to those people as "stupid," (Savoiardo Decl. Exs. UU, VV);

- in November 2013, Ciccoria was disruptive during an anti-discrimination seminar, (56.1 Stmt. & Resp. ¶¶ 227-28); another teacher testified that the comments made at this seminar were gender-related, not race-related, (*id.* ¶ 229);

- in 2014 or 2015, Swift told Piccola to document any complaints she had about Plaintiff in writing, and texted her in April 2015, stating he "need[ed] [her] letter again.  With your name typed then signed" because it "[h]as to be official.  District is fed up with him," (56.1 Stmt. & Resp. ¶ 239(d)-(e)); Piccola first complained about difficulty in working with Plaintiff in March 2013, (*see* Savoiardo Decl. Ex. VVV, at DEF20971), and filed written complaints on December 1, 2 and 10 in 2014, and April 10, August 28 and October 22, 2015, (56.1 Stmt. & Resp. ¶ 239(e); Schragin Decl. Ex. 32);

- in or around September 2014, Piccola complained that she did not want "another Hernandez" in her class, (AC ¶ 51);

- in October 2014, an unknown person urinated in Plaintiff's coffee pot, (56.1 Stmt. & Resp. ¶¶ 280-81);

- Plaintiff was not permitted to take certain professional development courses; the courses were first come/first served and were available through an online program called "My Learning Plan" and sometimes through email, (*id.* ¶¶ 243-45); in 2014, Plaintiff was given permission to take eleven of his thirteen requested courses, but was denied the opportunity to take a course entitled "Nonviolent Crisis Intervention," (*id.* ¶¶ 250-52); Plaintiff believes Swift denied his request because of his race, (*id.* ¶ 252);

- on the morning of November 5, 2014, Plaintiff found that an unknown person had used a bathroom in Plaintiff's hallway without flushing the toilet properly, (*id.* ¶¶ 276-77);

- in December 2015, Swift criticized Plaintiff via email, copying Plaintiff's union representative, after Plaintiff did not leave lesson plans for a substitute teacher in the appropriate place, (*see id.* ¶¶ 265-71); Plaintiff and other teachers believed that there

---

[5] Exactly what Swift said is unclear.  Plaintiff testified that Swift asked "Don't you guys know how to spell?" (Savoiardo Decl. Ex. H, at 258.)  Assistant Superintendent Maura McAward's investigation into Plaintiff's formal complaint, discussed below, recounts that Swift asked, "Can't you guys spell?"  (*Id.* Ex. GGG, at DEF000426.)  The Amended Complaint posed the question as "Don't you know how to spell?"  (AC ¶ 24.)  For simplicity's sake, I will refer to the question, "Can't you guys spell?"

were several appropriate places to leave lesson plans in the event of an absence, (*id.* ¶ 269);

- on October 16, 2015, Piccola told Plaintiff in front of his class that it was her right as an American to use the N-word, (56.1 Stmt. & Resp. ¶ 284; Savoiardo Decl. Ex. H, at 49, 54-55, 94);

- sometime in 2015, Plaintiff was harassed in an unspecified manner over his handwriting, (56.1 Stmt. & Resp. ¶ 274; Savoiardo Decl. Ex. H, at 49, 51);

- in early 2016, a baseball coach told an African-American student that "he runs as fast as a runaway slave" and called the student stupid, (56.1 Stmt. & Resp. ¶ 290);

Plaintiff did not report these incidents to the District or its administrators at any time, except (as noted below) he told an administrator in 2013 about Swift's spelling comment.

## B.  The District's Initial Investigations

At the District's behest, Fanelli conducted an investigation into whether the Iantorno Email violated the District's Internet Policy, the Prohibition Policy Against Discrimination and Harassment, or the Dignity for All Students Act.  (*Id.* ¶¶ 71-72.)  Fanelli's findings, which Kliszus adopted, (*id.* ¶ 74), were:  (1) the Iantorno Email was meant as a "humorous attempt to call attention to an observation," but its accompanying text was viewed by some as "beyond the threshold of tolerance," (*id.* ¶ 75); (2) this was Iantorno's first infraction, (*id.* ¶ 77); (3) no Middle School employee had sent similar emails since Swift had been principal, (*id.* ¶ 78); and (4) the email was "a severe error in judgment on a number of levels" and the "apology did not go far enough in proportion to the action itself," (*id.* ¶ 79).  Fanelli concluded that Iantorno violated the District's Internet Policy, noted that a critical evaluation had been placed in her file and recommended a copy of his report also be included.  (*Id.* ¶¶ 80-81.)  Fanelli suggested Iantorno draft an apology letter to distribute to the Middle School's staff, (*id.* ¶ 82), and that she find two

articles addressing similar situations and submit a written analysis, (*id.* ¶ 83). Iantorno drafted a letter of apology and completed the assignment as instructed. (*Id.* ¶¶ 84-85.)[6]

Kliszus, who had attended training sessions on how to conduct a discrimination investigation, (*id.* ¶ 87), investigated the Hockey Incident, (*id.* ¶ 86). Kliszus first met with Plaintiff on April 15, 2013, (*id.*), but before speaking with Plaintiff, sent an email to School Board members, informing them (among other things) that "there was no attack on anyone by the principal." (*Id.* ¶ 86(b).) Kliszus again met with Plaintiff, Swift, Fanelli and the president of Plaintiff's union on April 22, 2013. (*Id.* ¶ 89.) At this meeting, Plaintiff did not allege that Swift intentionally hit him with the hockey ball because of his race, (*id.* ¶ 94), but did contend he possessed emails documenting Swift's racially charged speech, (*id.* ¶ 92). Kliszus reviewed these emails and met with Swift to discuss them, (*id.* ¶¶ 99-100), and ultimately concluded that there was no evidence of racial animosity toward Plaintiff in the emails, (*id.* ¶ 101). Kliszus also met with two African-American District employees, who reported that they had not observed Swift engaging in racially inappropriate behavior or speech and did not believe that Swift would intentionally hit another teacher with a hockey ball. (*Id.* ¶¶ 95, 96.)

In his final report, (Savoiardo Decl. Ex. EEE),[7] Kliszus concluded that the Hockey Incident was an accident, adopted Plaintiff's recommendation to create a school culture committee, recommended that Plaintiff serve on that committee, and suggested that Plaintiff

---

[6] Plaintiff says he did not get the apology letter, but Defendants produced the letter, signed and dated February 13, 2013. (*Id.* ¶ 84; Savoiardo Decl. Ex. NN.) It is undisputed that Iantorno at least *wrote* such a letter.

[7] While Defendants in their 56.1 Statement detail only the steps Kliszus took during his investigation, Plaintiff in response contends that "[g]enuine issues of material fact exist" as to whether this was a "fair, unbiased and proper investigation into the assault of Mr. Berrie by Swift and [whether Swift] prejudged that it was accident." (*Id.* ¶¶ 97-98; *see id.* ¶ 86.) Plaintiff points to no evidence, however, that Kliszus failed to conduct a proper investigation other than Kliszus' denial that there had been an "attack," conclusory allegations that "Kliszus attempted to bully and pressure Mr. Berrie about his complaint," and the fact that Kliszus did not issue his final report for two months, during which time Swift received tenure. (*Id.* ¶ 86.)

"avail himself of appropriate supports to address concerns regarding anger management," (56.1 Stmt. & Resp. ¶¶ 97, 102, 105). Swift and Kliszus testified that the committee was formed the following year, and that all teachers were invited to serve on it, (*id.* ¶¶ 103-04); Plaintiff is not aware that such a committee was formed, (*id.*).

### C. <u>The McAward Investigation</u>

On July 30, 2013, Plaintiff's counsel sent a letter to the District with formal complaints about the Iantorno Email, the Hockey Incident and the New York Times Article. (*Id.* ¶¶ 106-07.) The District, through Assistant Superintendent McAward, investigated these incidents. (*Id.* ¶ 109.) McAward had received training in investigating discrimination allegations and had conducted several similar investigations in the past. (*Id.* ¶ 110.)

As part of her investigation, McAward interviewed Plaintiff on September 3, 2013, and informed him, among other things, that it was against District policy to retaliate against him and requested that he immediately report any retaliatory conduct. (*Id.* ¶¶ 111, 113.) After the interview, Plaintiff never made a complaint about retaliatory conduct to McAward. (*Id.* ¶ 114.) During the interview, Plaintiff told McAward about several other alleged incidents of discrimination, including a reduction in his hours and pay by 20% in 2002, (*id.* ¶¶ 115-16), the imposition of a fourth probationary year prior to his tenure decision, (*id.* ¶ 117; *see id.* ¶¶ 218-21), questioning of Plaintiff as to why he took a cell phone away from a white student in 2006, (*id.* ¶ 118; *see id.* ¶ 223)), an incident in 2006 in which a security guard told Plaintiff, "No happy Kwanzaa for you people," (*id.* ¶ 120), Swift declaring during an assembly on an unknown date that some parents did not come to vote on a bond issue because of their immigration status, (*id.* ¶ 123; Savoiardo Decl. Ex. GGG, at DEF000426), Swift stating that "physical education teachers shouldn't be paid the same as other teachers," (56.1 Stmt. & Resp. ¶ 122), and Swift criticizing

Plaintiff for misspelling his name in an email, asking "Can't you guys spell?" (*id.* ¶ 124; Savoiardo Decl. Ex. GGG, at DEF000426).

As part of her investigation, McAward reviewed Plaintiff's July 30, 2013 letter, the Board of Education Prohibition Policy Against Discrimination, Harassment and Sexual Harassment, all documents related to the Iantorno Email, and Kliszus's Findings and Investigation Report with its seven exhibits. (Savoiardo Decl. Ex. GGG, at DEF000441.) She interviewed three students who witnessed the Hockey Incident, (56.1 Stmt. & Resp. ¶¶ 127-28), both teachers Plaintiff identified regarding the 2006 cell phone incident, (*id.* ¶ 129), Iantorno, Fanelli and Swift, (*id.* ¶ 130), and other teachers mentioned during the investigation, (*id.* ¶ 131). McAward investigated the three incidents described in Plaintiff's initial complaint, as well as all other reported acts of discrimination.

With respect to the dated allegations, McAward found that there was insufficient evidence to justify a finding of racial discrimination for either the pay reduction or the fourth year of probation, (*id.* ¶¶ 138-40); the incident surrounding the Kwanzaa comment was resolved at the time and to Plaintiff's satisfaction, (*id.* ¶¶ 142-43); the cell phone incident did not violate any policy, (*id.* ¶ 145); and that Swift's comment about physical education teachers, while inappropriate, was not racially motivated, (*id.* ¶ 158). Nevertheless, McAward recommended that a critical letter be placed in Swift's file. (*Id.* ¶ 159.) McAward also found that the District properly handled and disciplined Iantorno for her email, (*id.* ¶ 148); that the eyewitnesses' accounts of the Hockey Incident were consistent with Swift's, (*id.* ¶¶ 149-53); and that it was an accident, (*id.* ¶ 156). She further found that Fanelli did not intend to imply that Plaintiff was an "angry black man," (*see id.* ¶ 164), but still determined that he acted inappropriately, albeit with good intentions, (*id.* ¶ 167), and recommended that a critical evaluation letter also be placed in

his file, (*id.* ¶ 168).  McAward instructed that Kliszus's report be amended to strike the suggestion that Plaintiff undergo anger management training.  (*Id.* ¶ 169.)  McAward did not find evidence of racial intolerance in the school.  (*Id.* ¶ 166.)

### D. **Plaintiff's 2013 Evaluation**

On December 5, 2013, Womack, who is African-American, (*id.* ¶ 95), observed Plaintiff's lesson, (*id.* ¶ 256).  During the lesson, a local firefighter was scheduled to come to the class for a demonstration, but was turned away.  (*Id.* ¶ 261.)  Plaintiff believes that Womack turned away the fireman and testified that Womack criticized Plaintiff's lesson plan, interfered with the lesson and was dismissive.  (*Id.* ¶¶ 260-61.)  In his Notice of Claim, which is dated December 12, 2013 – before Womack completed his written evaluation – Plaintiff stated that he "believes . . . that this year's evaluation will turn negative, in an effort to begin establishing a basis to remove him from the District."  (Savoiardo Decl. Ex. A, at 4.)  Womack's written evaluation, dated February 25, 2014, graded Plaintiff as "highly effective" in six out of the ten categories and "effective" in the other four.  (56.1 Stmt. & Resp. ¶ 258; *see* Savoiardo Decl. Ex. KKK.)  Plaintiff has not been subject to any discipline since filing his formal complaint regarding the Hockey Incident on April 18, 2013.  (56.1 Stmt. & Resp. ¶ 194.)

### E. **The District's Anti-Discrimination and Anti-Harassment Policy**

The District sent its Anti-Discrimination and Anti-Harassment Policy, (Savoiardo Decl. Ex. SSS) (the "Policy"), to all employees on April 23, 2013, May 6, 2013 and May 21, 2013, (56.1 Stmt. & Resp. ¶ 175; Savoiardo Decl. Exs. YYY, ZZZ, AAAA).  Swift testified that he discussed the Policy with the Middle School teachers at the beginning of every school year and that it was posted on the District's website, (Savoiardo Decl. Ex. K, at 117-19), and McAward testified that the Policy had been distributed to every employee sometime in the early or

mid 2000s, (*id.* Ex. L, at 34). The Policy "strictly enforces a prohibition against harassment and discrimination . . . [which] consists of unwelcome conduct, whether verbal or physical, that is based on a characteristic protected by law, such as sex, race, color, ancestry, national origin, religion, age, disability, marital status, or sexual orientation." (Savoiardo Decl. Ex. SSS, at 1.) It directs employees to report incidents of harassment to any supervisor or administrator. (*Id.* at 2.) The Policy includes the procedures governing what happens once a complaint is made and for reaching a resolution. (*Id.* at 2-4.)

The District adopted a revised anti-discrimination policy on October 30, 2013, and sent it to all employees on November 1, 2013. (56.1 Stmt. & Resp. ¶ 176; Savoiardo Decl. Ex. BBBB.) The District required all employees to attend a mandatory anti-discrimination and anti-harassment training on November 5, 2013, with a make-up session on December 2, 2013, which Plaintiff attended. (56.1 Stmt. & Resp. ¶ 178.)

### F. Procedural History

On June 9, 2015, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination and retaliation by the District. (Savoiardo Decl. Ex. C, at 1.) A notice of right to sue was issued on October 1, 2015. (AC ¶ 10.) Plaintiff filed a complaint with this Court on August 12, 2014, (Doc. 1),[8] and the Amended Complaint on December 29, 2015, alleging race discrimination and retaliation against the District, Swift and Fanelli under 42 U.S.C. § 1981 ("Section 1981") and the Equal Protection Clause of the Fourteenth Amendment, enforced through 42 U.S.C. § 1983 ("Section 1983"); against the District under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*; and against the District under Title VII of the Civil Rights Act of 1964 ("Title

---

[8] The original complaint did not contain claims under Title VII.

VII"). (*See generally* AC.) Defendants filed the instant motion on September 6, 2016. (Doc. 68.)

## II.     **LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

Affidavits in opposition to a motion for summary judgment "must be based upon concrete particulars, not conclusory allegations." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 451 (2d Cir. 1999) (internal quotation marks omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Id.* at 452; *see Major League Baseball Props.*, 542 F.3d at 310 ("A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory . . . .").

## III.    DISCUSSION

### A.    Statute of Limitations

Defendants argue that several of the allegations of discrimination must be dismissed because they are time-barred, (Ds' Mem. 2-6),[9] and do not constitute part of a continuing violation, (*id.* at 9-11).[10]

### 1.    NYSHRL Notice of Claim Requirement

Defendants argue that "under New York law, no action for discrimination or retaliation can be maintained against a school district or its employees unless the plaintiff serves a notice of claim in compliance with General Municipal Law § 50-h within ninety . . . days of the alleged discriminatory or retaliatory act, and the action is commenced within one . . . year of the accrual of the claim." (Ds' Mem. 5 (citing N.Y. Educ. Law § 3813).)  Because Plaintiff filed his Notice of Claim on December 12, 2013, (Savoiardo Decl. Ex. A); *see Varsity Transit, Inc. v. Bd. of Educ. of City of N.Y.*, 840 N.E.2d 569, 570 (N.Y. 2005) (new notice of claim must be filed for new allegations), Defendants argue that Plaintiff's NYSHRL claim is limited to the ninety-day period between September 12, 2013 and December 12, 2013.  Plaintiff responds that a Notice of Claim is not required for a NYSHRL claim, (P's Mem. 28-29), and even if it is, Plaintiff satisfied the statutory notice requirement through his July 30, 2013 formal complaint, the filing of this

---

[9] "Ds' Mem." refers to the Memorandum of Law in Support of Defendants' Motion for Summary Judgment.  (Doc. 70.)

[10] Plaintiff does not address whether he is entitled to the continuing violation exception and concedes that his claims are limited to four years for the Section 1981 claim, three years for the Section 1983 and NYSHRL claims, and 300 days prior to filing his EEOC charge for his Title VII claims.  (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("P's Mem."), (Doc. 72), 25-26.)  But the continuing violation exception often applies to hostile work environment claims.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117-18 (2002).  Therefore, in an abundance of caution, I have considered the merits of Defendants' argument that the continuing violation exception does not apply and have analyzed Plaintiff's claims accordingly.

lawsuit on August 12, 2014, the Notice of Claim filed on December 12, 2013 and the EEOC charge on June 9, 2015, (Doc. 79 at 1-2).

The Second Circuit is currently undecided on whether a NYSHRL claim against a school district requires a Notice of Claim. After first deciding that such a claim does not require a Notice of Claim pursuant to N.Y. Educ. Law § 3813(1), *see Carter v. Syracuse City Sch. Dist.*, No. 15-2395, 2016 WL 3671631 (2d Cir. 2016), the Second Circuit later withdrew that decision and remanded the case to consider whether the New York Court of Appeals' decision in *Margerum v. City of Buffalo*, 28 N.E.3d 515 (N.Y. 2015) – which held that "a notice of claim need not be filed for a Human Rights Law claim against a municipality" if the action is not based in tort, *id.* at 516 – had an impact on the analysis, *see Carter v. Syracuse City Sch. Dist.*, 656 F. App'x 566, 567 (2d Cir. 2016) (summary order).[11] Following these two rulings, courts within the Second Circuit have disagreed on *Margerum*'s application. *Caputo v. Copiague Union Free School District*, No. 15-CV-5292, 2016 WL 6581865 (E.D.N.Y. Nov. 4, 2016), held that *Margerum* clarified that claims under NYSHRL "are not tort action[s] under Education Law [§ 3813(2)] and therefore a notice of claim for a NYSHRL claim against a school district or its personnel is not required." *Id.* at *6. Conversely, Judge Lewis Kaplan in *United States v. New York City Department of Education*, No. 16-CV-4291, slip op. (S.D.N.Y. Apr. 4, 2017), recently reasoned that *Caputo* failed to take into account the fact that Section 3813 has two subdivisions: Section 3813(2) is limited to cases "founded on tort," while Section 3813(1) is open to "any cause whatever." *Id.* at 2-3. Section 3813(1) requires that allegations may not be the subject of a lawsuit unless first presented to the school within three months after the claim's accrual, but does

---

[11] Plaintiff cites the original *Carter* decision, (P's Mem. 28), but the text of the decision is no longer available. The subsequent opinion contains a summary of the procedural history, including the Second Circuit's original holding.

not reference New York General Municipal Law ("GML") § 50-e,[12] which was at issue in *Margerum*.

I agree with Judge Kaplan that *Margerum* does not do away with the notice requirement under Section 3813(1). The plain language of Section 3813(1), however, does not (unlike Section 3813(2)) require a formal notice of claim or refer to GML § 50-e, but only states that the claims must have been "presented to the . . . district or school within three months after the accrual of such claim" prior to filing a complaint. I thus conclude that the requirement is met by any document sufficiently formal and detailed for the District to investigate the claims.

On July 30, 2013, Plaintiff sent the District a letter containing formal complaints of the three primary allegations of discrimination, (56.1 Stmt. & Resp. ¶ 106), and Plaintiff filed a Notice of Claim on December 12, 2013, Savoiardo Decl. Ex. A). Plaintiff also filed a charge with the EEOC on June 9, 2015. (Savoiardo Decl. Ex. C.) Therefore, if the continuing violation exception did not apply, Plaintiff's NYSHRL claims would be limited to the periods of May 1, 2013 – July 30, 2013, September 12, 2013 – December 12, 2013, and March 11, 2015 – June 9, 2015.[13] But as discussed below, the statutory period here is broadened due to that exception.

### 2. Continuing Violation

"[E]mployment discrimination claims arising under . . . § 1981 are subject to the four-year federal 'catch-all' statute of limitations . . . ." *Bedden-Hurley v. N.Y.C. Bd. of Educ.*, 385 F. Supp. 2d 274, 278 (S.D.N.Y. 2005) (citing *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369,

---

[12] GML § 50-e, which is incorporated by reference in N.Y. Education Law § 3813(2), states that where the filing of a notice of claim is "a condition precedent to the commencement of an action," GML § 50-e(1)(a), "[t]he notice shall be in writing, sworn to by or on behalf of the claimant, and shall set forth: (1) the name and post-office address of each claimant, and of his attorney, if any; (2) the nature of the claim; (3) the time when, the place where and the manner in which the claim arose; and (4) the items of damage or injuries claimed to have been sustained so far as then practicable . . . ." *Id.* § 50-e(2).

[13] Plaintiff argues that the complaint in this action serves as notice, but Section 3813(1) clearly states that the three month notice requirement is a prerequisite to filing such a complaint.

382-83 (2004)); *see James v. Countrywide Fin. Corp.*, 849 F. Supp. 2d 296, 317-18 (E.D.N.Y. 2012). A three-year statute of limitations governs Section 1983 and NYSHRL claims for race discrimination and retaliation. *Milan v. Wertheimer*, 808 F.3d 961, 963 (2d Cir. 2015) (Section 1983); *Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012) (NYSHRL). Before filing suit under Title VII, a plaintiff must exhaust his administrative remedies by filing a charge with the EEOC within 300 days of the accrual of the claim. *See* 42 U.S.C. § 2000e-5(e)(1). Any claim not brought within 300 days is time barred. *See Morgan*, 536 U.S. at 109-10; *Choi v. Chem. Bank*, 939 F. Supp. 304, 310-11 (S.D.N.Y. 1996).

Plaintiff filed his first complaint in this Court on August 12, 2014, (Doc. 1), and filed his charge with the EEOC on June 9, 2015, (Savoiardo Decl. Ex. C). Accordingly, Plaintiff's Section 1981 claims prior to August 12, 2010, his Section 1983 claims prior to August 12, 2011, his Title VII claims prior to August 13, 2014, and his NYSHRL claims falling outside the periods between May 1, 2013 – July 30, 2013, September 12, 2013 – December 12, 2013, and March 11, 2015 – June 9, 2015 are time barred unless he "can successfully invoke [the continuing violation] exception to the limitations period." *Bermundez v. City of N.Y.*, 783 F. Supp. 2d 560, 574 (S.D.N.Y. 2011).

A claim for hostile work environment is not "time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Morgan*, 536 U.S. at 122. Such "a continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998) (internal quotation marks omitted), *abrogated in part on other*

*grounds by Morgan*, 536 U.S. 101.[14]  But acts that are "isolated in time . . . from each other, and . . . from the timely allegations[] . . . break the asserted continuum of discrimination" and are untimely.  *Id.*

Plaintiff "waives his right to recovery" for any alleged discriminatory acts occurring prior to August 12, 2010.  (P's Mem. 25 n.13.)  Indeed, the 2002 and 2006-2008 incidents are too "isolated in time . . . from the timely allegations" to be included in a continuing violation.  *Quinn*, 159 F.3d at 766.  But the allegations that occurred in 2010 and thereafter may be included in Plaintiff's claim if they are related and were permitted by the employer to continue unremedied, or are part of a specific discriminatory policy.  *See id.* at 765-66.

The continuing violation doctrine is applicable here only in part.  At least one act allegedly contributing to the hostile work environment falls within each of the relevant statutes of limitations, including Fanelli sending the New York Times Article on May 4, 2013 for the Section 1981, Section 1983 and NYSHRL claims, and the coffee pot and bathroom incidents in October and November 2014 for the Title VII claim.  The allegations that fall outside at least one of the relevant statutes of limitations include:  (1) a female teacher sitting on Plaintiff's lap in 2010; (2) Swift's asking Plaintiff "Can't you guys spell?" sometime between 2010 and 2012; (3) Ciccoria's disruption during the anti-discrimination seminar; (4) the Iantorno Email; (5) the Hockey Incident; (6) the New York Times Article; and (7) Swift reporting at the April 15, 2013 meeting that someone had asked him "When are we going to get rid of Plaintiff and how fast are we going to get rid of him?"

---

[14] The continuing violation exception can apply to Section 1981, Section 1983, Title VII and NYSHRL claims.  *See Bermudez*, 783 F. Supp. 2d at 574 ("The continuing-violation exception is most often invoked by plaintiffs alleging claims under Title VII, but it is also applied by courts in employment discrimination cases brought under Sections 1981 and 1983, and under New York State . . . law.").

Of these allegations, the female teacher sitting on Plaintiff's lap and Ciccoria's disruption are not "part of the same actionable hostile work environment practice," *Maxton v. Underwriter Labs., Inc.*, 4 F. Supp. 3d 534, 544 (E.D.N.Y. 2014) (internal quotation marks omitted), as allegations of sexual harassment are distinct from Plaintiff's claim of a hostile work environment based on race, and Plaintiff's timely allegations were actions "taken by different co-workers," *id.*; *see Bright v. Coca Cola Refreshments USA, Inc.*, No. 12-CV-234, 2014 WL 5587349, at *4 (E.D.N.Y. Nov. 3, 2014) ("The inquiry into whether timely and untimely acts are sufficiently related to invoke the continuing violation doctrine is flexible and fact-specific. Incidents that involve different perpetrators, actions, or targets, or are temporally distant from one another, may be insufficiently related.") (citation omitted), *aff'd*, 639 F. App'x 6 (2d Cir. 2015) (summary order). The remaining allegations, however, were arguably perpetrated by the same few actors and sufficiently related, and therefore subject to the continuing violation exception. *See Bright*, 2014 WL 5587349, at *4 ("[S]ufficient relatedness may be found where the timely and untimely incidents involve the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers.") (internal quotation marks omitted).

Therefore, with the exception of the incidents discussed above, I will consider all claims that occurred after 2010 for the Section 1981, Section 1983 and Title VII claims, and all claims that occurred between 2010 and December 12, 2013 and between March 11, 2015 and June 9, 2015 for the NYSHRL claim.

## B. <u>Hostile Work Environment</u>

Plaintiff asserts hostile work environment claims under Section 1981, Section 1983, Title VII, and NYSHRL. Because the standards applied to these federal and state claims are the same, *see Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1048 (2d Cir. 1992) (noting "New York's wholesale

adoption of federal standards in discrimination cases under Executive Law § 296"); *Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2*, 798 F. Supp. 2d 443, 451 (E.D.N.Y. 2011) ("The standard for showing a hostile work environment under Title VII, Section 1981, Section 1983, and the New York State Human Rights Law is essentially the same."); *Ayton v. Lenox Hill Hosp.*, No. 93-CV-6601, 1997 WL 10000, at *1 n.1 (S.D.N.Y. Jan. 10, 1997) ("Courts require the same standards and burdens of proof for claims brought under Title VII, § 1981, and the [NYSHRL]."), I will analyze them together.

To succeed on a hostile work environment claim, Plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted). Courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. Plaintiff must come forward with "evidence not only that [he] subjectively perceived the environment to be hostile or abusive," but also that an objectively reasonable employee would perceive it to be so. *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003); *see Dawson v. Cty. of Westchester*, 351 F. Supp. 2d 176, 186 (S.D.N.Y. 2004). Furthermore, "[a] plaintiff must also demonstrate that [he] was subjected to the hostility because of [his] membership in a protected class." *Brennan v. Metro Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999).

"To decide whether the [hostile work environment] threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). "Pervasive"

harassment is harassment that is "'more than episodic,'" and instead "'continuous and concerted.'" *Hayut*, 352 F.3d at 745 (quoting *Carrero v. N.Y.C. Hous. Auth.*, 890 F.2d 569, 577 (2d Cir. 1989)). "For racist comments, slurs, and jokes to constitute a hostile work environment, there must be 'more than a few isolated incidents of racial enmity.'" *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (quoting *Snell v. Suffolk Cty.*, 782 F.2d 1094, 1103 (2d Cir. 1986)). Instead, "there must be a steady barrage of opprobrious racial comments." *Id.* at 110 (internal quotation marks omitted). "The environment," however, "need not be unendurable or intolerable." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (internal quotation marks omitted). "[T]he fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases." *Id.* (internal quotation marks omitted). Moreover, "[a] single incident in which the conduct alleged crosses the line from mere insults to physical force . . . is more likely to support a hostile work environment claim." *Cruz v. Liberatore*, 582 F. Supp. 2d 508, 519 (S.D.N.Y. 2008) (citations omitted). Likewise, the Second Circuit has not ruled out the possibility that a "one-time use of a severe racial slur could, by itself, support a hostile work environment claim when evaluated in the cumulative reality of the work environment." *Daniel v. T&M Protection Res., LLC*, No. 15-560, 2017 WL 1476598, at *1 (2d Cir. Apr. 25, 2017) (summary order).

"[T]he Second Circuit has cautioned [that] the existence of a hostile work environment is a mixed question of law and fact. These kinds of questions are especially well-suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue." *Hill v. Taconic Developmental Disabilities Servs. Office*, 181 F. Supp. 2d 303, 321 (S.D.N.Y. 2002) (citation and internal quotation marks omitted), *vacated on other grounds by* 57 F. App'x 9 (2d Cir. 2003).

Plaintiff alleges that the following incidents amount to a race-based hostile work environment: (1) the Iantorno Email; (2) the Hockey Incident; (3) the New York Times column; (4) a female teacher sitting on Plaintiff's lap;[15] (5) Swift chastising Plaintiff by asking, "Can't you guys spell?" and for missing meetings; (6) the unflushed toilet incident; (7) the coffee pot incident; (8) criticism regarding Plaintiff's lesson plans; (9) Piccola's statements that it was her First Amendment right to use the N-word, that Plaintiff talked "too black," and that she "did not want another Hernandez" in her class; (10) Ciccoria referring to "porch monkeys" in Plaintiff's presence; (11) Swift's criticism of Plaintiff's handwriting; and (12) a baseball coach saying an African-American student "runs as fast as a runaway slave." (P's Mem. 8-9.)[16]

Plaintiff argues that a single incident of physical assault such as the Hockey Incident could satisfy a hostile work environment claim, (*id.* at 9), but the cases to which he cites involve physical assaults that were intentional acts, *see, e.g.*, *Patterson v. Cty. of Oneida*, 375 F.3d 206, 213 (2d Cir. 2004) (defendants "jumped and assaulted" plaintiff, sprayed him with mace, punched him in the ribs and covered him with shaving cream while making a racially offensive comment); *Jean-Louis v. Am. Airlines*, No. 08-CV-3898, 2010 WL 3023943, at *1 (E.D.N.Y. July 30, 2010) (defendant's employee punched Plaintiff in the face, necessitating medical

---

[15] As previously discussed, this allegation falls outside the statute of limitations for the Title VII claim as it is more than 300 days before Plaintiff filed his EEOC charge and does not fit within the continuing violation exception.

[16] In his brief, Plaintiff excludes some alleged acts of discrimination discussed in the 56.1 Statement and originally raised in his Amended Complaint from both the hostile work environment and retaliation analyses, (*id.* at 8-9, 19), including (1) the March 21, 2011 email from Swift declaring that he did not want to "take your tired, hungry, and oppressed," (56.1 Stmt. & Resp. ¶ 239(a)), (2) Swift recounting the question, "When are we going to get rid of [Plaintiff] and how fast are we going to get rid of him?" (*id.* ¶¶ 238-39), and (3) being denied permission to take some professional development courses, (*id.* ¶ 250-52). Regardless of whether this was intentional, I do not consider these three acts relevant to either analysis. Indeed, the phrase "tired, hungry, and oppressed" is an obvious (though incorrect) reference to the poem on the Statue of Liberty, *The New Colossus* by Emma Lazarus, and has no racial overtone; Swift's restatement of the inquiry regarding when the school could "get rid" of Plaintiff was merely that – a restatement – and a sentiment with which he did not agree; and being granted permission to take eleven of thirteen requested professional development courses is hardly hostile or retaliatory (apart from the absence of a connection to race).

treatment); *Cruz*, 582 F. Supp. 2d at 519 (defendant allegedly slapped plaintiff across the face and used "physically threatening[] and humiliating" conduct). Swift hit a hockey ball in the gymnasium, which struck Plaintiff in the head. (56.1 Stmt. & Resp. ¶ 36(g); Savoiardo Decl. Ex. GGG, at DEF000429.) Swift testified that the ball accidentally deflected off of a student's hockey stick before striking Plaintiff, and Plaintiff cannot dispute this because, he says, he was hit while his back was to Swift. (56.1 Stmt. & Resp. ¶¶ 36(g), 39.) Defendants have set forth evidence that the incident was an accident, and Plaintiff put forth no evidence other than his personal belief that it was intentional or based on race. (*Id.* ¶ 36.) Such subjective belief is insufficient to create a triable issue of fact. *See Fadia v. New Horizon Hosp.*, 743 F. Supp. 2d 158, 168 (W.D.N.Y. 2010).

Further, "the Second Circuit has made it clear that allegations of mistreatment lacking a linkage or correlation to the claimed ground of discrimination cannot form a basis for a valid hostile work environment claim." *Johnson v. Morrison & Foerster LLP*, No. 14-CV-428, 2015 WL 845723, at *7 (S.D.N.Y. Feb. 26, 2015) (alteration and internal quotation marks omitted); *see Paul v. Post Graduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 168 (E.D.N.Y. 2015) ("[I]t is . . . important in hostile work environment cases to exclude from consideration acts taken against the plaintiff that lack a linkage or correlation to the claimed ground of discrimination.") (alterations and internal quotation marks omitted). Allegations of unfair treatment directed at a member of a protected class do not create a fact issue for trial absent a basis to conclude that that unfair treatment arose *because of* the victim's membership in that class. *See Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) ("Even if [plaintiff's] highly dubious claim that he was unfairly singled out for punishment by the instructors is credited, [plaintiff] has done little more than cite to his alleged mistreatment and ask the court to conclude that it must have been

related to his race.") (alterations and internal quotation marks omitted); *Varughese v. Mount Sinai Med. Ctr.*, No. 12-CV-8812, 2015 WL 1499618, at *42 (S.D.N.Y. Mar. 27, 2015) ("fallacy" for plaintiff to say: "I belong to a protected class; something bad happened to me at work; therefore, it must have occurred because I belong to a protected class") (internal quotation marks omitted).

Swift's criticism of Plaintiff's handwriting and failure to follow the substitute-teacher lesson plan procedure, along with a female coworker sitting on Plaintiff's lap, fall into this category. Plaintiff presents no reason to suspect that these instances occurred because Plaintiff is in a protected class, and thus they cannot be considered in connection with his hostile work environment claim. Similarly, there is no evidence – other than Plaintiff's personal belief – that the unflushed toilet and coffee pot incidents, as well as Swift hitting Plaintiff with the hockey ball, were based on Plaintiff's race. That access to the bathroom in question was limited – from which Plaintiff infers that it was either Defendants or someone acting on their behalf who failed to flush, (56.1 Stmt. & Resp. ¶ 276; Savoiardo Decl. Ex. H, at 49) – is not enough for a reasonable juror to infer racial animus (or even that the failure to flush was intentional), particularly considering the school was open to the public for Election Day the day before, (Savoiardo Decl. Ex. H, at 89-91).

Excluding these claims, there remain only six allegations of discrimination that occurred in or after 2010, including (1) the Iantorno Email, (2) the New York Times column, (3) Swift's emailing asking, "Can't you guys spell?" (4) Piccola's statements, (5) Ciccoria referring to "porch monkeys," and (6) the baseball coach's statement that an African-American student "runs as fast as a runaway slave," not all of which are reasonably interpreted as showing discriminatory

intent.[17]  Even if they did, Defendants argue, summary judgment has been granted in similar circumstances.  (Ds' Mem. 19-21 (citing *Stembridge v. City of N.Y.*, 88 F. Supp. 2d 276 (S.D.N.Y. 2000).)  I agree.  While in no way condoning these disparaging comments, six remarks over a three to four year period do not, as a matter of law, rise to the level of a hostile work environment.  *See Stembridge*, 88 F. Supp. 2d at 286 (seven instances of racial hostility over the course of three years does not create hostile work environment); *Carter v. Cornell Univ.*, 976 F. Supp. 224, 232 (S.D.N.Y. 1997) ("[D]isparaging comments on the issue of race . . . do not in themselves constitute a 'hostile' or 'abusive' environment because there were at most six such comments, and they were made over a period of years."), *aff'd*, 159 F.3d 1345 (2d Cir. 1998) (summary order),[18] and are no "more than a few isolated incidents of racial enmity," *Schwapp*, 118 F.3d at 110 (internal quotation marks omitted), not a "steady barrage of opprobrious racial comments," *id.* (internal quotation marks omitted).[19]

## C.  *Faragher/Ellerth* Defense

Even if reasonable minds could differ as to whether the conditions Plaintiff identifies amount to a hostile work environment, Plaintiff's claim fails because on the undisputed facts, the District has satisfied the elements of the *Faragher/Ellerth* defense.

The Second Circuit has adopted the Supreme Court's *Faragher/Ellerth* framework for determining whether an employer is liable for a hostile work environment created by its employees.  *See Ferraro v. Kellwood Co.*, 440 F.3d 96, 101 (2d Cir. 2006); *Chenette v. Kenneth*

---

[17] The New York Times column seems plainly well intentioned even if off-key, and there is no reason to suspect "you guys" in Swift's comment referred to black people as opposed to, say, gym teachers.

[18] None of the remarks here, some of which are despicable, rise to the level of severity of the slur considered in *Daniel*, 2017 WL 1476598, at *1.

[19] The NYSHRL claim is further limited to acts of discrimination that occurred before December 12, 2013 by the Notice of Claim requirement as discussed above, leaving only incidents:  (1) the Iantorno Email, (2) the New York Times column, and (3) Swift's criticism of Plaintiff's handwriting.

*Cole Prods., Inc.*, No. 05-CV-4849, 2008 WL 3176088, at *10 (S.D.N.Y. Aug. 6, 2008), *aff'd*, 345 F. App'x 615 (2d Cir. 2009) (summary order).  Under that standard, if an employee has not suffered a tangible employment action, *Pugni v. Reader's Digest Ass'n, Inc.*, No. 05-CV-8026, 2007 WL 1087183, at *17 (S.D.N.Y. Apr. 9, 2007),[20] an employer can avoid liability by establishing that "(1) the employer exercised reasonable care to prevent and correct promptly any discriminatory harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Ferraro*, 440 F.3d at 101 (alteration and internal quotation marks omitted).

"One way for employers to demonstrate that they exercised reasonable care is to show that they had an anti-harassment policy in place."  *Mack v. Otis Elevator Co.*, 326 F.3d 116, 128 (2d Cir. 2003), *abrogated on other grounds by Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013).  But the mere existence of an anti-harassment policy is not dispositive.  *Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir. 2004).  If the policy is ineffective – for example, if an employer fails to adequately or promptly investigate a complaint, or the policy is generally ignored – the employer may not avail itself of the *Faragher/Ellerth* defense.  *See id.* (reversing grant of summary judgment because defendant had not "conclusively demonstrated the effectiveness of its anti-harassment policy").  An employer is considered to have reasonably addressed the allegations if it makes a timely inquiry, *see Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013), and takes proper and reasonable remedial measures, *see Rios v. Buffalo & Fort Erie Pub. Bridge Auth.*, 326 F. App'x 612, 614 (2d Cir. 2009) (summary order).

---

[20] Plaintiff does not contend that he was subject to a tangible employment action.  He did not, for example, lose his job, suffer a demotion, or receive discipline.

The District's Anti-Harassment Policy "strictly enforces a prohibition against harassment and discrimination . . . [which] consists of unwelcome conduct, whether verbal or physical, that is based on a characteristic protected by law, such as sex, race, color, ancestry, national origin, religion, age, disability, marital status, or sexual orientation." (Savoiardo Decl. Ex. SSS, at 1.) The Policy articulates that incidents of discrimination experienced by an employee should be reported by an administrator to the Superintendent, the Assistant Superintendents, or their designees. (*Id.* at 2.) Once a complaint is made, the District will conduct an investigation, which may include interviews of the person filing the complaint as well as possible witnesses and the target of the complaint, and disciplinary actions will be taken as necessary. (*Id.* at 2-3.) The Policy also includes the procedures for how to reach informal and formal resolutions of discrimination and harassment concerns. (*Id.* at 3-4.)

As to the first prong of the *Faragher/Ellerth* defense, the Policy was distributed on April 23, 2013 and again on May 6, 2013, and May 21, 2013 (56.1 Stmt. & Resp. ¶¶ 174-75; Savoiardo Decl. Exs. YYY, ZZZ, AAAA), and it was revised on October 30, 2013 and redistributed to all employees on November 1, 2013, (56.1 Stmt. & Resp. ¶ 176; Savoiardo Decl. Ex. BBBB). On November 5, 2013 and December 2, 2013, the District held mandatory anti-discrimination and anti-harassment trainings. (*Id.* ¶¶ 177-78; *see* Savoiardo Decl. Ex. CCCC.) District officials also testified that the Policy had been distributed previously, (Savoiardo Decl. Ex. L, at 34 (policy was distributed "sometime in the early or mid 2000s," but not every year)), that it was posted on the District's website, (*id.* Ex. K, at 117-19), and that Swift discussed the Policy with teachers at the beginning of every school year, (*id.* Ex. K, at 116; *see id.* Ex. N, at 23 (Piccola testifying that she recalled Swift's yearly meetings at which discrimination was discussed)). Plaintiff has provided no evidence to the contrary except his own assertions that he

personally did not know the procedures for reporting acts of harassment or discrimination. (*Id.* Ex. G, at 142-43.) Accordingly, the District properly disseminated and trained its employees in anti-discrimination and anti-harassment policies and procedures.[21]

Moreover, the District exercised reasonable care to prevent and correct discrimination through its investigations. After the Iantorno Email, Kliszus immediately assigned Fanelli to investigate, and Fanelli issued his findings about a week after the email was sent. (*See* 56.1 Stmt. & Resp. ¶¶ 70, 74.)

Kliszus also investigated the Hockey Incident by meeting with Plaintiff twice, meeting with other teachers and reviewing emails Plaintiff submitted as alleged evidence of racial animus.[22] (*Id.* ¶¶ 86, 89, 92, 93, 95.) Plaintiff argues that this investigation "was a sham" and conducted in an untimely manner, (P's Mem. 13), pointing to cases that found that somewhere between two and eleven days for a complete investigation was proper, *see Wahlstrom v. Metro-N. Commuter R.R. Co.*, 89 F. Supp. 2d 506, 525 (S.D.N.Y. 2000) (investigation was completed after two days, but it took six weeks to reprimand employee); *Gonzalez v. Beth Israel Med. Ctr.*, 262 F. Supp. 2d 342, 354 (S.D.N.Y. 2003) (eleven days). While it may have been poor judgment to email the School Board before speaking with Plaintiff, and while the final report was issued

---

[21] Plaintiff argues that many teachers at the Middle School "were [not] aware of the policy" and cites to deposition testimony of several employees. (P's Mem. 11; 56.1 Stmt. & Resp. ¶ 174; Savoiardo Decl. Ex. P, at 62, 64-66; *id.* Ex. S, at 16; *id.* Ex. N, at 26, 28.) But in each of these depositions, the line of questioning is primarily regarding the Port Chester Middle School Teacher Handbook, (Savoiardo Decl. Ex. UUU), which admittedly does not contain an anti-discrimination or anti-harassment provision. The anti-discrimination policy is a separate document, (*id.* Ex. XXX), and was distributed separately from the Handbook, (*id.* Exs. YYY, ZZZ, AAAA). Indeed, some of these teachers testified that they remembered having received anti-discrimination and anti-harassment training more than once, (*id.* Ex. S, at 10-12; *id.* Ex. P, at 59-60; *id.* Ex. N, at 23 (describing meetings at the beginning of the year that discuss discrimination)), that they knew how to report incidents of discrimination, (*id.* Ex. S, at 17; *id.* Ex. P, at 65-66; *id.* Ex. N at 27), and that they had seen an anti-discrimination and anti-harassment policy, (*see, e.g., id.* Ex. O, at 50-51). That Plaintiff did not inquire during discovery as to whether the District's employees received the Policy via email as Defendants contend does not defeat the *Faragher/Ellerth* defense.

[22] The Court has reviewed the emails, (Savoiardo Decl. Ex. EEE, at DEF000500-15), and (except for the Iantorno Email) they betray no racial overtone.

more than two months after the incident occurred, (*id.* Ex. EEE), these facts are insufficient for a reasonable jury to conclude that the investigation "was a sham," (P's Mem. 13).  Indeed, the cases to which Plaintiff cites do not say that more than eleven days is *per se* unreasonable, only that a prompt investigation was evidence that the employer acted reasonably.  *See Gonzalez*, 262 F. Supp. 2d at 354-55.  Here, any initial delay in interviewing Plaintiff cannot be regarded as unreasonable because Plaintiff stayed home from work for a week following the Hockey Incident, (56.1 Stmt. & Resp. ¶ 47), and told a District employee the day following the incident that he did not wish to pursue the matter further, (Savoiardo Decl. Ex. EEE, at DEF000484).  Nevertheless, Kliszus interviewed Swift prior to Plaintiff returning to work, and set up a meeting on April 15, 2013 to discuss the Hockey Incident with Plaintiff, Swift, Womack, and Coffin.  (*Id.* Ex. EEE, at DEF000485.)  Plaintiff's only other support as to why the investigation was allegedly inadequate was that Swift had been granted tenure between the time Kliszus began the investigation and before he issued the final report, (P's Mem. 14-15), but he provides no explanation as to why or how this tainted Kliszus's investigation.

But even if Kliszus's report was somehow tainted with bias or was untimely, McAward's extensive investigation more than makes up for it.  McAward investigated the three incidents submitted in Plaintiff's July 30, 2013 letter, as well as all other reported allegations.  (56.1 Stmt. & Resp. ¶¶ 138-42.)  She interviewed those involved in each case, reviewed any relevant documents and prior investigations, and reviewed the District's official policies for any possible violations thereof.  (Savoiardo Decl. Ex. GGG, at DEF000421-40.)  She issued a nineteen-page report with five exhibits, (*id.*), and even though she found that there were no violations of the District's policies, that proper prior investigations were made into Plaintiff's prior complaints, and that none of the acts were racially motivated, she recommended that critical evaluations be

placed in Swift's and Fanelli's files, (56.1 Stmt. & Resp. ¶¶ 159, 168). Plaintiff has presented no evidence that McAward's investigation was insufficient or tainted in any way. Thus, no reasonable jury could conclude that the District's investigations or responses to Plaintiff's complaints were inadequate. *See Gonzalez*, 262 F. Supp. 2d at 355.

With respect to the other allegations Plaintiff identifies here but did not raise with McAward or during the other investigations, the undisputed facts reveal he unreasonably failed to take advantage of the District's policies. Plaintiff argues that "any complaint [would have been] futile because of the impropriety of the District's investigation into his previous complaints, the fact that the District did nothing to address his prior complaints, and the fact that other complaints were ignored." (56.1 Stmt. & Resp. ¶¶ 114, 254, 263, 272, 275, 279, 282, 288, 289, 291.) "[A] failure to report . . . harassment may be excused where the employee has a 'credible fear that her complaint would not be taken seriously or that she would suffer some adverse employment action as a result of filing a complaint.'" *Chin-McKenzie v. Continuum Health Partners*, 876 F. Supp. 2d 270, 284-85 (S.D.N.Y. 2012), (quoting *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 246 (2d Cir. 2001)). "A credible fear must be based on more than the employee's subjective belief. Evidence must be produced to the effect that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints." *Leopold*, 239 F.3d at 246.

But Plaintiff has presented no evidence – aside from conclusory allegations – from which a reasonable juror could conclude that the District ignored or failed to address his prior complaints, or undertook improper investigations. To the contrary, the District addressed each of Plaintiff's prior complaints, even for incidents that occurred more than ten years prior, and there is no evidence that any complaint was ignored. Plaintiff may be referring to instances in which

he allegedly discussed discriminatory incidents with Fanelli and, according to Plaintiff, Fanelli "would basically talk [him] down from it." (P's Mem. 16 (quoting Savoiardo Decl. Ex. H, at 242).)[23] Plaintiff did not invoke the policy on these occasions, however, nor was he given any indication that if he did, the District would not take him seriously. *See Delgado v. City of Stamford*, No. 11-CV-1735, 2015 WL 6675534, at *30-31 (D. Conn. Nov. 2, 2015) (plaintiff's superior warning plaintiff against complaining to a higher level did not amount to "evidence . . . to the effect that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints") (internal quotation marks omitted).

Therefore, because on the undisputed facts the District had a properly disseminated anti-discrimination policy in place, and conducted reasonable investigations into all presented allegations of discrimination, and because Plaintiff could have but did not raise other allegations, the District may avail itself of the *Faragher/Ellerth* defense. Accordingly, Plaintiff's Section 1981, Section 1983, Title VII and NYSHRL hostile work environment claims are dismissed.

## D. Retaliation

Plaintiff also asserts retaliation claims under Section 1981, Section 1983, Title VII and NYSHRL.

Retaliation claims are analyzed using the *McDonnell Douglas* burden-shifting framework. *See Jute Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005); *Cruz v. Oxford Health Plans, Inc.*, No. 03-CV-8863, 2008 WL 509195, at *10 (S.D.N.Y. Feb. 26, 2008). A plaintiff bears the initial burden of establishing a *prima facie* case of discrimination, and the burden of proof at this stage is "'de minimis.'" *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539,

---

[23] The one example Plaintiff gave in his deposition in which Fanelli apparently dissuaded Plaintiff from making an official complaint was for an incident involving potential sexual harassment, (Savoiardo Decl. Ex. H, at 265-66), not race discrimination.

582 (S.D.N.Y. Aug. 27, 2012) (quoting *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)).

"[B]ut it is not non-existent." *Pleener v. N.Y.C. Bd. of Educ.*, No. 05-CV-973, 2007 WL

2907343, at *11 (E.D.N.Y. Oct. 4, 2007) (internal quotation marks omitted), *aff'd*, 311 F. App'x

479 (2d Cir. 2009) (summary order). If the plaintiff meets this burden, the defendant must offer

a legitimate, non-retaliatory reason for its actions. *Id.* at 582-83. "If the employer produces

evidence of a non-retaliatory justification for the adverse employment action," the plaintiff must

demonstrate that there is sufficient evidence for a reasonable juror to find that the reason offered

by the defendant is pretext for retaliation. *Id.* at 583.[24]

To establish a *prima facie* case of retaliation, Plaintiff must show that: (1) he was

engaged in activity protected under anti-discrimination statutes; (2) Defendants were aware of

Plaintiff's participation in the protected activity; (3) Defendants took adverse action against

Plaintiff; and (4) there is a causal connection between Plaintiff's protected activity and the

adverse action taken by defendants. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d

712, 720 (2d Cir. 2010). To establish an adverse employment action, "a plaintiff must show that

a reasonable employee would have found the challenged action materially adverse, which . . .

means it well might have dissuaded a reasonable worker from making or supporting a charge of

discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal

quotation marks omitted). A plaintiff may establish the causal connection indirectly by showing

that the protected activity was closely followed by the retaliation, or directly by showing

evidence of retaliatory animus. *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d

---

[24] This framework applies to Title VII, 42 U.S.C. §§ 1981 and 1983, and New York Executive Law § 296 claims. *See, e.g.*, *Weinstock*, 224 F.3d at 42 n.1 (identical standards apply to employment discrimination claims brought under Title VII and New York Executive Law § 296); *Thomas v. N.Y. City Health & Hosps. Corp.*, No. 02-5159, 2004 WL 1962074, at *16 n.7 (S.D.N.Y. Sept. 2, 2004) ("While *McDonnell Douglas* and *Burdine* involved claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, courts have held that discrimination and retaliation claims brought under 42 U.S.C. §§ 1981 and 1983 follow the same analysis.").

Cir. 1993). Finally, while "'individuals are not subject to liability under Title VII,'" *Sassaman v. Gamache*, 566 F.3d 307, 315-16 (2d Cir. 2009) (quoting *Patterson v. Cty. of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004)), a plaintiff seeking to hold an individual personally liable for retaliation under 42 U.S.C. §§ 1981, 1983 must demonstrate that the defendant was personally involved in the retaliatory conduct at issue. *See Stevens v. New York*, 691 F. Supp. 2d 392, 401 (S.D.N.Y. 2009) (citing *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74 (2d Cir. 2000)). "Title VII is not a general 'bad acts' statute," *Wimmer v. Suffolk Cty. Police Dep't*, 176 F.3d 125, 135 (2d Cir. 1999) (internal quotation marks omitted), and "'petty slights or minor annoyances that often take place at work and that all employees experience' do not constitute actionable retaliation," *Hicks*, 593 F.3d at 165 (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68).

Plaintiff claims that the Defendants retaliated against him after he reported discrimination. (P's Mem. 17-21.) Specifically, Plaintiff argues that he was subjected to retaliatory acts that "would deter any reasonable employee from complaining," (*id.* at 19), including: (1) the Hockey Incident; (2) the New York Times Article; (3) Kliszus's "sham" investigation; (4) Swift asking, "Can't you guys spell?;" (5) Piccola's complaints at Swift's encouragement; (6) Piccola stating it was her right to use the "N-word" and calling Plaintiff's students stupid; (7) Plaintiff's performance review by Womack; and (8) the coffee pot and toilet incidents, (*id.*) These actions do not amount to retaliation either individually or collectively. *See Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) ("Alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct."). But his case fails on the adverse action and causal connection prongs.

First, Swift's email asking "Can't you guys spell?" occurred between 2010 and 2012, before Plaintiff's protected activity. (56.1 Stmt. & Resp. ¶¶ 234-37.) Second, contrary to his assertions, Plaintiff's performance review was far from negative. The review rated Plaintiff as "high effective" in six categories, and "effective" in the remaining four, and the comments were only positive, stating things such as "[t]he teacher's response to a student's incorrect response respect the student's dignity," and "[t]he dialogue and interaction between Mr. Berrie and the students was respectful and appropriate." (Savoiardo Decl. Ex. KKK.) This evaluation was not "negative," and even if it was, it would not constitute an adverse employment action. *See Uddin v. City of N.Y.*, 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006).

Third, Plaintiff presents no evidence from which it could be inferred that Piccola's complaints were causally related to Plaintiff's protected activity. While causation may be established through a showing that the retaliatory act closely followed the protected activity, *see Cosgrove*, 9 F.3d at 1039, Piccola first complained about Plaintiff in March 2013 (before Plaintiff complained about the Hockey Incident), and then filed three complaints in December 2014, one on April 10, 2015, one on August 28, 2015 and one on October 22, 2015 – four months, eight months, twelve months, and sixteen months after Plaintiff filed his complaint in this Court, and one or more years after Plaintiff first submitted his letter to the District, *see Chamberlin v. Principi*, 247 F. App'x 251, 254 (2d Cir. 2007) (summary order) (causal connection needed for a *prima facie* case may be established by showing protected activity was "closely followed in time" by adverse action, but five months is not "close") (internal quotation marks omitted); *James v. Newsweek*, No. 96-CV-393, 1999 WL 796173, at *15 (S.D.N.Y. Sept. 30, 1999) (four-month lapse between protected activity and adverse actions insufficient to establish causal connection), *aff'd*, 213 F.3d 626 (2d Cir. 2000) (summary order). Further, that

Piccola apparently had issues with Plaintiff before his protected activity weakens any inference of temporal proximity even further. Finally, Plaintiff does not allege that anything happened to him as a result of his coworker's complaints. Likewise, there is no evidence from which it could be inferred that Piccola's comment about the N-word in October 2015 bore any causal connection to any protected activity by Plaintiff, would deter an employee of reasonable firmness from complaining, or was known to (let alone the responsibility of) any Defendant. Accordingly, Piccola's statements cannot be regarded as retaliatory action on Defendants' parts.

Excluding those four allegations of retaliation, the four that remain are the Hockey Incident,[25] the New York Times Article, Kliszus's investigation, and the coffee pot and toilet incidents. None of these is an adverse employment action in itself, and in the aggregate they do not rise to the level of "materially adverse." There are no facts to suggest that the Hockey Incident was intentional, much less that it was done to retaliate. Providing the New York Times column to Plaintiff was not an adverse action; it was a gesture of help to Plaintiff, even if ill-advised. Plaintiff has presented no evidence other than his own conclusory testimony that the coffee and bathroom incidents were conducted by any of the Defendants or their agents. Finally, failing to conduct a proper investigation is not retaliatory. *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) ("[A]n employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint.").

---

[25] It is hard to imagine for what this incident could have been retaliation, given that Plaintiff had, two months earlier, said he was "good," "had moved on," and thought it was time to "shut down" the criticism of Iantorno despite her "deeply offen[sive]" email. (56.1 Stmt. & Resp. ¶¶ 26, 28; Savoiardo Decl. Exs. II, KK.)

Accordingly, Plaintiff's retaliation claims under Section 1981, Section 1983, Title VII, and NYSHRL are dismissed.[26]

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED. The Clerk of the Court is respectfully directed to terminate the pending motion, (Doc. 68), enter judgment for the Defendants, and close the case.

**SO ORDERED**.

Dated: May 31, 2017
White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

---

[26] I need not discuss Defendants' remaining arguments.